## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT AND ARREST WARRANT

I, Tyler Bolen, being first duly sworn, hereby depose and state as follows:

## I.     INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant, under Rule 41 of the Federal Rules of Criminal Procedure, and in support of a criminal complaint and application for an arrest warrant.

2.      I am a Special Agent with the United States Forest Service (the "USFS"), and have been for three years. Prior to this, I was a USFS Law Enforcement Officer for nearly eight years. I am currently assigned to the Shasta-Trinity National Forest; however, I periodically investigate crimes on other National Forests such as the Lassen National Forest.  I am authorized, and presently assigned, to investigate and enforce violations of federal law that affect national forest lands, including willfully setting fire to any timber, underbrush, or grass upon lands owned by the United States, in violation of 18 U.S.C. § 1855.

3.      I received eight months of full time, formalized training at the Federal Law Enforcement Training Center in Brunswick, Georgia. In addition to my other law enforcement duties, I am a fully qualified wildland fire investigator, having completed the following courses: Fire Investigation 210—Wildland Fire Origin and Cause Investigation Course, and Fire Investigation 310—Wildland Fire Investigation Case Development Course. During these courses of training, I received training in the professional standards of wildland fire investigation, fire behavior, identifying and recognizing burn patterns, identifying and collecting fire scene evidence, investigation methodology, interviewing, search warrant development, and courtroom preparation and testimony. Additionally, I hold a Master of Arts degree in Criminal Justice.

4.      I am a "law enforcement officer" of the United States within the meaning of that term contained at 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations of, and to initiate arrests for, various offenses that occur on or affect national forest lands.

5.      In addition to my training, I am an experienced wildland fire investigator.  From

2013 through 2015, I was a member of the USFS Region 3 Fire Investigation Team that responded to complex fire investigations in Arizona and New Mexico. From 2016 through 2018, I was a member of the USFS Region 5 Fire Investigation Team in California, while also serving as a wildland fire investigation instructor responsible for training new investigators. During the course of my career, I have prepared, sworn to, and served over fifty federal search warrants associated with private properties, public land sites, internet and cellular-based companies, cellular phones, and vehicle tracking devices. I have investigated over fifty wildland fires, including many fires determined to be acts of arson.  I have investigated, identified, apprehended, and interviewed several wildland arson suspects to include suspected serial arsonists that have set multiple fires over various periods of time. I have been the affiant on federal search warrants associated with cellular phones and vehicles possessed and used by arsonists during the commission of their arson crimes and have obtained evidence of arson during the course of these lawful searches. The facts in this affidavit are based on my personal observations and on my training and experience, as well as on consultations with other investigators.

## II.    SCOPE OF REQUESTED WARRANTS

6.      Based on the facts set forth below, I submit that probable cause exists to believe that violations of 18 U.S.C. § 1855 (the "specified federal offense"), with respect to the "Ranch Fire" in Lassen County, California, was committed by GARY STEPHEN MAYNARD who agents have observed living out of his vehicle, which is a black 2012 Kia Soul displaying California license plate 6XBA609.

7.      This affidavit is submitted in support of an application for a warrant to search a black Kia Soul (the SUBJECT VEHICLE), with California license plate 6XBA609, a vehicle more fully described in Attachment A in order to locate and seize the items described in Attachment B as evidence or instrumentalities of the specified federal offenses.

8.      This affidavit is also made in support of a criminal complaint and application for a warrant to arrest GARY STEPHEN MAYNARD for committing the specified federal offense for willfully setting fire to lands owned by or under the jurisdiction of the United States.

9.      This affidavit is intended to show merely that there is sufficient probable cause for the criminal complaint and requested warrants and does not set forth all of my knowledge about this matter.

## III.      BACKGROUND

### A.      Fire Investigation Techniques.

10.     As a wildland fire spreads, it leaves behind fire pattern indicators. Fire pattern indicators are physical objects that display changes from exposure to heat, flame, and combustion byproducts. Analyzing fire pattern indicators helps fire investigators determine the origin of wildland fires because accurate analysis of fire pattern indicators reveals the direction in which wildland fires spread. Additionally, wildland fire investigators can use fire pattern indicators to determine the location where wildland fires originally ignite through a process known as "backtracking."

11.     Upon locating the origin location of a wildland fire, wildland fire investigators then determine the cause of the fire. Based on my training and experience, I know that there are nine causal categories of wildland fires. These categories are, in no particular order: (i) lightning, (ii) campfires, (iii) smoking, (iv) debris burning, (v) arson/incendiary, (vi) equipment use, (vii) railroads, (viii) children, and (ix) miscellaneous. The miscellaneous category includes several sub-categories of fire causes such as fireworks, firearms, and welding.

12.     To determine the cause of a wildland fire, fire investigators engage in a systematic examination of the fire's origin location and adjacent area.  This analysis leads to the exclusion of causal categories for which no evidence exists. For example, if fire investigators find no evidence of equipment use within the fire's general origin area, then the wildland fire investigators can and do logically exclude equipment use as the fire's cause. This systematic methodology, which requires a careful examination of a fire's origin location and adjacent area, eventually leads to fire investigators making a causal determination. Typically, this determination occurs once fire investigators logically exclude all but one cause of the wildland fire based on evidence recovered within the fire's origin area and adjacent area.

13.     As stated above, one of the nine causal categories of wildland fire is

arson/incendiary—fires that are deliberately or maliciously set by humans. Based on my training and experience, I know that there are many indications of arson-caused fires, including the following:

- They often ignite in areas where other arson-suspected fires have been set in the past;

- They are commonly set near roads that can accommodate motor vehicle travel;

- They are frequently characterized by a lack of causal evidence within the origin location and surrounding geographic area, because of the ease with which an arsonist can ignite a wildland fire simply by applying a lighter to brush;

- They are often set during low-traffic conditions, such as nighttime hours, as this reduces the risk they will be seen by witnesses.

**B.** **Locations Where Evidence Is Likely to Be Found.**

14.    Based on my training and experience, I know that arsonists need a physical location to store items relating to their illegal activities. Such items can include, but are not limited to, incendiary materials or devices, maps, instructional manuals, photographs, and other materials. In my training and experience, arsonists frequently store such items in their personal vehicles under their dominion and control.

15.    Based on my training and experience, I also know that arsonists derive pleasure and satisfaction from observing first responders react to the fires that arsonists set. Indeed, experiencing this pleasure and satisfaction is one of the primary motivators for arsonists to set fires. One way for arsonists to preserve these feelings of pleasure and satisfaction is to take photographs or record video footage of first responders reacting to fires that arsonists set.  These photograph and video files are frequently stored in arsonists' private residences, on their mobile cellular devices, or on their personal computers contained in their residences.

16.    Based on my experience and knowledge obtained from other agents, I know that cellular phones are commonly in the possession of the vast majority of people, including arsonists. I know that arsonists have been known to use their cellular phones' Internet browsing capabilities to research arson crimes, techniques, and arson laws. I further know that individuals

have been known to upgrade the physical devices associated with a cellular phone number while retaining the older replaced devices under their possession and control.

## IV.     ARSON INVESTIGATIONS ON THE SHASTA TRINITY NATIONAL FOREST

### A.     Investigation of the Cascade Fire on July 20, 2021

17.     On July 20, 2021, at approximately 9:45 a.m., a wildland fire was reported by a mountain biker in the Sand Flat area on the western slopes of Mt. Shasta. I spoke with this mountain biker who advised that he had smelled smoke while riding his bike. The mountain biker eventually spotted the fire burning along the forest floor several hundred feet from the dirt road. This fire was later designated as the Cascade Fire. This mountain biker and a fellow mountain biker were very concerned and jumped into action by stomping along the edge of the ground fire and digging around its perimeter in efforts to prevent its spread. The mountain biker also called 911 to report the wildfire. At approximately 10:25 a.m., firefighters arrived on scene. The actions of the mountain bikers and final suppression efforts of the firefighters prevented the Cascade Fire from developing into a large-scale wildfire and was ultimately contained to an approximate 100-200 square feet area of burned vegetation. The Cascade Fire occurred on federal lands designated as the Shasta-Trinity National Forest within the Eastern District of California.

18.     USFS Fire Investigator (Inv.) Brian Murphy responded to this newly reported fire in order to conduct an origin and cause investigation. Inv. Murphy has been a certified wildland fire investigator for six years and has investigated over thirty wildland fires.

19.     Inv. Murphy[1] conducted an origin and cause investigation of the Cascade Fire. Inv. Murphy located and examined the origin of the Cascade Fire and did not locate any sources that could have ignited the fire. After considering the nine causal categories of wildland fire, Inv. Murphy excluded all potential causes of this fire, except arson. After visiting the scene and reviewing the facts in the case, I concurred that the ignition of this fire was not only suspicious,

but consistent with arson.

20.     This remote area of the Cascade Fire receives little traffic. To access the area, motorists turning off of the Everitt Memorial Highway, must drive several miles along Sand Flat Road—a dirt road that winds through a portion of the western slopes of Mt. Shasta. Eventually, in order to access the area of the Cascade Fire, motorists must turn and travel along a non-maintained dirt road that is fairly rough. This un-named dirt road is occasionally used by off-road enthusiasts. The Cascade Fire was situated approximately 75 yards from this un-named dirt road where there are no developed recreational sites or trails.

21.     On this day, Inv. Murphy observed two vehicles parked along this un-named dirt road approximately 150-200 yards from the Cascade Fire. Inv. Murphy first approached the closest vehicle to the Cascade Fire, a black Kia Soul displaying California license plate 6XBA609 (the SUBJECT VEHICLE). At that time, the SUBJECT VEHICLE's front tires were positioned in a deep rut and the rear underside was high-centered on a large boulder. Inv. Murphy observed a white male laying on the ground underneath the SUBJECT VEHICLE and was digging and moving about in efforts to free the SUBJECT VEHICLE from its immobile position. Inv. Murphy introduced himself as an official with the Forest Service and requested the man's name. This man did not come out from under the vehicle and did not identify himself, but instead stayed under the vehicle and mumbled words that Inv. Murphy could not understand. Inv. Murphy advised this man that he would like to ask him a few questions. The man quit digging and stood up. Inv. Murphy began to ask questions about the nearby fire to which this man responded that he did not know anything about any fires. As Inv. Murphy attempted to ask additional questions, this man asked Inv. Murphy to pull his SUBJECT VEHICLE from its stuck position. Inv. Murphy replied that he was not authorized to use his government vehicle to tow other vehicles. Upon hearing this, the man appeared agitated, and turned away from Inv. Murphy where he returned to digging and working to free the SUBJECT VEHICLE from its position. Inv. Murphy recognized the man's uncooperative and agitated behavior and felt it was safest to distance himself from this man. Prior to departing, Inv. Murphy took a photograph of the SUBJECT VEHICLE.

22.     Inv. Murphy later advised me the driver of the SUBJECT VEHICLE was a white male that stood approximately six feet tall, with an average size frame, short brown hair, and wore glasses. Inv. Murphy also recalled during his brief interaction that he had asked this man where he was from, to which this man mumbled something about being a professor at a university down south. I believe this man, as further discussed in this affidavit, was the registered owner of the SUBJECT VEHICLE, Gary MAYNARD. Because Inv. Murphy recalled this man, suspected to be MAYNARD, stated he was a university professor,  I conducted a public internet search and observed pictures of a Dr. Gary Maynard, who is listed on public internet sites as a professor at various universities in California. I observed these pictures of Dr. Gary Maynard matched the California driver's license picture of the SUBJECT VEHICLE's registered owner, Gary MAYNARD.

23.     Inv. Murphy then proceeded to the second vehicle that was parked approximately 100 feet away from the SUBJECT VEHICLE. Inv. Murphy found it was occupied by one man, further referred to as Witness 1. Witness 1 advised that he had been parked in that location since the previous day. Witness 1 advised Inv. Murphy that he was not sure how the wildfire started. Witness 1 said that the SUBJECT VEHICLE had showed up earlier that morning before the wildfire started.

24.     On July 21, 2021 (the next day), Inv. Murphy and I returned together to the scene of the Cascade Fire. The SUBJECT VEHICLE was no longer present, however, Witness 1 was still present in the same location. At this time, Witness 1 further described his observations during the time that the Cascade Fire ignited the previous day. Witness 1 stated that he not seen any people or vehicles around the area until the SUBJECT VEHICLE arrived several hours before the fire ignited. Witness 1 recalled the SUBJECT VEHICLE had attempted to drive across the partially buried boulder that was situated within the rough road-bed and became high-centered and immobile.

25.     Witness 1 recalled the driver of the SUBJECT VEHICLE was alone. Witness 1 told me this driver seemed very angry and at one point threw things out of the SUBJECT VEHICLE and on to the ground. Witness 1 stated that he had brief interactions with the driver

of the SUBJECT VEHICLE but described concerns about the man's enraged behavior and said that, at one point, the man pulled out a large knife and looked towards Witness 1 for unknown reasons. Witness 1 believed the man was mentally unstable, describing the man as, "mumbling a lot and having bipolar-like behavior."  Witness 1 did not feel comfortable around the driver of the SUBJECT VEHICLE and mostly stayed near his own vehicle approximately 100 feet away.

26.     At one point, later that morning, Witness 1 recalled watching the driver of the SUBJECT VEHICLE walking away in the same direction that the Cascade Fire soon ignited. Witness 1 said that the driver was gone for approximately ten minutes, then returned to the SUBJECT VEHICLE. At some point that morning, after the driver returned to the SUBJECT VEHICLE, Witness 1 recalled seeing the smoke from the Cascade Fire.

27.     Witness 1 recalled the driver of the SUBJECT VEHICLE standing approximately six feet and one inch tall, weighed approximately 200 pounds, had short/thin brown hair, and wore glasses.

28.     After meeting with Witness 1, I proceeded to examine the location where the SUBJECT VEHICLE had been photographed by Inv. Murphy in its stuck position within the rough roadbed. During my examination of this location, I noticed a small burned area on the ground just a few feet off the road. The small burned area consisted of burnt sticks and burned material that was consistent with newspaper. I could still see what looked to be newspaper print on some of the partially burned pieces. The small ground fire had been set along the forest floor and the ashes and the burned paper was still fluffy and grey which indicated that the fire had not been extinguished with water. Instead, the fluffy ash and fine pieces of paper were still in-tact, indicating that the fire had burned out on its own. There was no evidence of a campfire or a campfire ring; the small fire had been set directly on the uncleared forest floor along the road where the SUBJECT VEHICLE had been recently positioned.

29.     Inv. Murphy and I further examined the nearby forest floor and located a second small burned area that once again consisted of small pieces of burned wood and a material that was consistent with newspaper. This fire, too, had been ignited directly on the forest floor and just a few feet from where the SUBJECT VEHICLE had been stuck, except that it had been set

on the opposite side of the road. This small fire also contained fluffy ashes, with fine pieces of burned paper still in-tact, while exhibiting no evidence that the fire had been extinguished with water or any other means such as stomping, scraping, or stirring the ground. This fire's appearance also indicated that the fire had burned out on its own.

30.     The two small ground fires were each determined to be acts of arson and, indeed, classified as two additional arson fires. During my examination of this location, I also located a wooden match on the ground at the location where the SUBJECT VEHICLE had been stuck. The match head was still in-tact, indicating that this particular match had not been used.

31.     The dirt roadbed where the SUBJECT VEHICLE had been stuck and eventually travelled through contained the tire track impressions for the SUBJECT VEHICLE. Additionally, Inv. Murphy's photograph of the SUBJECT VEHICLE includes an angle of the tires. I reviewed this photograph and could see that the tread pattern, as photographed on the tires of the SUBJECT VEHICLE, matched the tire track impressions in the soil.

32.     I took measurements of these tire track impressions that still remained in the soil where the SUBJECT VEHICLE had been recently stuck. The width of the tire impressions on the dirt road was approximately 7 ½ inches in length. The width of the wheel base, which I measured from the outer edge of the driver-side tire impressions to the outer edge of the passenger-side tire impressions, was approximately 5' 9" to 5' 10" in length. I located these same tire tread impressions and tire impression dimensions at a second arson fire, further discussed below.

    **B.     Investigation of the Everitt Fire on July 21, 2021**

33.     On July 21, 2021 at approximately 2:50 a.m., a USFS fire engine crew was travelling along the Everitt Memorial Highway when the fire crew observed the glow of a new fire burning nearby. The fire was burning in vegetation along Forest Service Road 40N88, approximately 200 yards from the Everitt Memorial Highway. This new fire, designated as the Everitt Fire, had also ignited along the western slopes of Mount Shasta, federal lands designated as the Shasta-Trinity National Forest within the Eastern District of California. The fire crew, having spotted the recently ignited fire, was able to quickly contain the fire at less than one acre

in size.

34.     On this same morning, Inv. Murphy conducted an origin and cause investigation of the Everitt Fire. Inv. Murphy located and examined the origin of the Everitt Fire. After considering the nine causal categories of wildland fire, Inv. Murphy excluded all potential causes of this fire, except arson. Inv. Murphy did not locate any sources that could have ignited the fire within its area of ignition.

35.     On this same morning, I also arrived on scene of the Everitt Fire. This was the second wildland arson fire in less than twenty-four hours on Mount Shasta near the Everitt Memorial Highway. After visiting the scene and examining the area, I concurred that the ignition of this fire was not only suspicious, but once again consistent with arson.

36.     I observed the Everitt Fire had ignited along the dirt road and I began examining tire track impressions left behind in the soil. Beginning near the fire's edge, I observed three sets of different tire impressions on the road. Two of the tracks were consistent with aggressive (all-terrain/ mud tire tread) tires used by responding fire trucks. I observed the third set of tire impressions to be similar to the SUBJECT VEHICLE's tire impressions and noted how the more aggressive fire truck tire impressions crossed over on top of the suspected SUBJECT VEHICLE'S tire impressions—indicating that the SUBJECT VEHICLE had driven along the dirt road prior to the arrival of the fire trucks. A short distance later, there was a wide shoulder along the dirt road and I observed tire impressions consistent with one of the fire trucks having turned around and returned to the fire.

37.     At that point, there were two tire impression tracks that continued along the dirt road, with the fire truck tire impressions crossing over on top of the suspected SUBJECT VEHICLE's impressions—indicating that the SUBJECT VEHICLE had driven along the dirt prior to the arrival of the fire truck. I later identified this specific fire truck and matched its tire impressions to the impressions left behind in the soil. I continued following the two different tire track impressions until I reached a point that was approximately 200 yards north of the Everitt Fire. It was here that the dirt road widened again and was wide enough for a vehicle to turn around. It was here that tire impressions consistent with the SUBJECT VEHICLE had turned

around and travelled back towards the Everitt Fire and the Everitt Memorial Highway. I took measurements of these tire impressions. The width of the tire impressions was approximately 7 1/2 inches in length. The width of the wheel base, which I measured from the outer edge of the driver-side tire impressions to the outer edge of the passenger-side tire impressions, was approximately 5' 9" in length. I observed the tire tread pattern, the width of the tire impressions, and the width of the wheel base impressions to be the same as the SUBJECT VEHICLE.

### C.   Further Investigation of Maynard and the Subject Vehicle

38.   I reviewed the registration records for the SUBJECT VEHICLE maintained by the California Department of Motor Vehicles. The registration record shows that California license plate 6XBA609 is assigned to a 2012 Kia, which is the same make as the SUBJECT VEHICLE. The SUBJECT VEHICLE's registration record lists the owner as Gary MAYNARD and an address of 164 South Morrison Avenue, San Jose, California 95126. According to the California Department of Motor Vehicles (DMV), MAYNARD has a valid California driver's license that was issued in 2020, which also lists his address as [XXX] South Morrison Avenue, San Jose, California 95126. I obtained a copy of the California DMV picture on file for MAYNARD and showed this picture to Inv. Murphy. Inv. Murphy looked at this driver's license picture and told me that MAYNARD looked similar to the man he saw with the SUBJECT VEHICLE.

39.   According to the physical characteristics listed on MAYNARD's driver's license, MAYNARD is a white male, is 5'11" tall, weighs 175 pounds, has short/thin brown hair, and is required to wear corrective lenses when driving a vehicle. These physical characteristics displayed on MAYNARD's driver's license are similar to the descriptions of the driver of the SUBJECT VEHICLE as provided by Inv. Murphy and Witness 1.

40.   Although MAYNARD's California driver's license and MAYNARD's registration record of the SUBJECT VEHICLE both list [XXX] South Morrison Avenue, San Jose, California 95126, I do not believe MAYNARD currently resides there. During the course of this investigation, I consulted with the San Jose Police Department's dispatch services who advised me that in October of 2020, a concerned citizen had contacted the San Jose Police

Department with concerns about their colleague, MAYNARD who worked as a professor at Santa Clara University. This concerned citizen told officers that MAYNARD had told her he was suffering from anxiety, depression, split personality, and that he wanted to kill himself. This concerned citizen said that MAYNARD had moved out and was possibly living somewhere out of his vehicle. A dispatcher with the San Jose Police Department advised me that officers drove to this address on July 22, 2021 and July 25, 2021 and did not see the SUBJECT VEHICLE present.

**D.    Investigation of Maynard's Suspected Cell Phone Number**

41.    This concerned citizen gave the San Jose Police officers a phone number for MAYNARD. This phone number was (XXX) XXX-0738 (Maynard's suspected cell phone number).

42.    In an effort to further determine whether this was a valid phone number for MAYNARD, I spoke with Special Agent Jeremy Smart with the U.S. Department of Agriculture (USDA), Office of Inspector General. Agent Smart, having access to the USDA Electronic Benefits Transfer (EBT) database, checked if MAYNARD was a carrier of an EBT card. Agent Smart advised me that MAYNARD indeed has an active EBT account and this account lists MAYNARD's phone number as (XXX) XXX-0738—the same phone number that MAYNARD's colleague had given to the San Jose Police Department in 2020. Agent Smart further advised that according to recent activity, MAYNARD used this same phone number on July 26, 2021, to check his EBT account balance.

43.    Additionally, Agent Smart advised me that MAYNARD had used his EBT card during the course of several recent purchases made at: a Safeway store in San Francisco, California on July 12, 2021; a Safeway store in Fortuna, California on July 18, 2021; and a Safeway store in Susanville, California on July 24, 2021.

44.    As previously discussed, the dates of the arson fires in the Mount Shasta area were July 20 and 21, 2021. Prior to these fires, on July 18, 2021, the EBT card was used in Fortuna, California. Fortuna is situated along the northern California coast approximately 223 miles west of Mount Shasta. Following this transaction, there was a six-day gap where no EBT

transactions were recorded, which is during the time period of the arson fires. Then, the next transaction was made in Susanville, California on July 24, 2021. Susanville is located approximately 131 miles southeast of Mount Shasta. The locations of MAYNARD's EBT transactions indicate that MAYNARD has been recently travelling throughout vast areas of northern California.

45.     Agents reviewed video recordings that had been captured on July 24, 2021 from inside the Safeway store located at 2970 Main Street, Susanville, California 96130 during the time period that MAYNARD had used his EBT card. Agents observed the individual that was using MAYNARD's EBT card closely resembled MAYNARD. I showed this Safeway video recording to Inv. Murphy who advised me this was the same man he observed with the SUBJECT VEHICLE during his investigation of the Cascade Fire on July 20, 2021.

46.     MAYNARD's suspected cell phone number, (XXX) XXX-0738, is a Verizon wireless phone number. On July 26, 2021, I submitted a preservation letter to Cellco Partnership DBA Verizon Wireless, requesting that they preserve all records associated with this phone number between July 1, 2021 and August 1, 2021. This includes certain records such as call detail records, text messages, multi-media messages, cell site data, location information, and subscriber information.

**E.     Bradley Fire on July 11, 2021**

47.     Prior to the July 20 and 21, 2021 arson fires in the Mount Shasta area, agents investigated a wildland fire that ignited on July 11, 2021 on federal lands designated as the Shasta-Trinity National Forest south of the Mount Shasta area. This fire, designated as the Bradley Fire, destroyed over 300 acres of the national forest. Agents completed an origin and cause investigation of the Bradley Fire. The ignition site was located near a dirt road where someone had started the fire directly on top of the forest floor without clearing away any debris adequate to prevent a fire's escape. Agents located a frying pan which indicated this ignition site may have been used as a cooking fire. However, because of the negligence in starting a fire on the uncleared forest floor during high-fire danger levels, agents were unable to rule out arson as a possible cause behind this fire's ignition. The investigation of the Bradley Fire is ongoing, with

no criminal charges having been filed.

48.     During the course of this investigation, agents documented and took measurements of the suspect vehicle's tire impressions that were left behind on the soil next to the ignition site of the Bradley Fire. These were the only tire impressions located in this remote area. I compared the tire impressions left behind at the two Mount Shasta arson sites to the tire impressions left behind at the Bradley Fire. The wheel base dimensions are similar, approximately 5'9" wide. The tire track impressions left behind at the Bradley Fire did not leave a crisp-looking tire tread pattern in the soil and agents attributed this to the very soft and sandy soil composition at the Bradley Fire. Nonetheless, the less visible tire tread pattern left behind at the Bradley Fire appeared similar to the SUBJECT VEHICLE.

49.     Also, during this comparison, I observed there was a difference in the width of the tire impression itself. The width of the tire impression left behind at the Bradley Fire was approximately 1-2 inches wider than the tire impressions left behind in the soil of the two arson fires on Mount Shasta. However, the soil composition at the Bradley Fire is much softer and sandier than the soil composition located at the higher altitude of the two arson fires on Mount Shasta. On July 26, 2021, agents conducted a test by driving along the soil at one of the Mount Shasta arsons (Everitt Fire) and taking a measurement of the width of their tire impression in the soil. Then agents conducted the same procedure at the site of the Bradley Fire where the soil composition is much softer and sandier. At the conclusion of this test, agents discovered that the measurement of their tire track impression left behind on the soil at the scene of the Bradley Fire was 1-2 inches wider. This comparison indicates that the tire impressions left behind at the Bradley Fire are similar to those of the SUBJECT VEHICLE.

**F.     Sweetbriar Fire on July 6, 2021**

50.     During the late-night hours of July 6, 2021, firefighters responded to a reported fire burning along Interstate 5, just south of Dunsmuir, California. This area is located approximately 12 miles south of Mount Shasta. Investigators did not locate any evidence or sources that could have ignited the fire, later designated as the Sweetbriar Fire. The fire burned less than one acre of state land. The ignition site was located near a northbound interstate exit

(Connant Road) where there is a large dirt parking area. The Sweetbriar Fire was determined to be arson caused by an unknown person. Although investigators did not find any physical evidence, the Sweetbriar Fire also bears the hallmarks of wildland arson.

### G.   Cellular Phone Search Warrants served on July 29, 2021

51.    On July 29, 2021, I applied for two search warrants for MAYNARD's suspected cellular phone number. One of these search warrant applications was for precise cell-phone locations of MAYNARD's suspected phone number and the second search warrant application was for historical cell-site information for MAYNARD's suspected phone number.

52.    On July 29, 2021, U.S. Magistrate Judge Dennis M. Cota issued a search warrant that required Cellco Partnership DBA Verizon Wireless to disclose precise cell-phone locations of MAYNARD's suspected cell phone number pursuant to search warrant number 3:21-sw-0013-DMC. On this same day, U.S. Magistrate Judge Dennis M. Cota issued a search warrant that required Cellco Partnership DBA Verizon Wireless to disclose historical cell-site information for MAYNARD's suspected cell phone number pursuant to search warrant number 3:21-sw-0014-DMC. Following the issuance of these search warrants, on this same day, I served these two search warrants on Cellco Partnership DBA Verizon Wireless.

53.    On July 30, 2021, Cellco Partnership DBA Verizon Wireless began electronically sending agents locations of MAYNARD's suspected cell phone number. The locations were being sent to agents about every fifteen minutes and show MAYNARD's suspected cellular phone signal locations in a latitude and longitude format. The locations sent by Cellco Partnership DBA Verizon Wireless include a weblink of each location via Google maps. On this day, beginning at approximately 9:49 a.m., the location of MAYNARD's cellular phone number was showing cellular signals in Susanville, California with an approximate six-hundred meter radius. Susanville, California is a city located in Lassen County within the Eastern District of California.

### H.   Vehicle Tracker Search Warrant

54.    On August 1, 2021, while positioned along Conard Road on the Lassen National Forest, agents observed MAYNARD driving the SUBJECT VEHICLE. A short time later,

agents observed MAYNARD with the SUBJECT VEHICLE at the Safeway store in Susanville, California, prior to returning to the Lassen National Forest. After these agents had confirmed that MAYNARD was still operating the SUBJECT VEHICLE, on this same day, I applied for a vehicle tracking warrant for the SUBJECT VEHICLE. Later this same day, U.S. Magistrate Judge Dennis M. Cota issued a vehicle tracking warrant that authorized agents to install a tracking device on the SUBJECT VEHICLE.

55.     On August 3, 2021, agents observed the SUBJECT VEHICLE parked once again at the Safeway store in Susanville, California and observed MAYNARD to still be in control of the SUBJECT VEHICLE. A short time later, agents observed MAYNARD depart the Safeway store. Moments later, I observed an officer with the Susanville Police Department conduct a traffic stop of MAYNARD as he drove through Susanville in the SUBJECT VEHICLE. I observed the SUBJECT VEHICLE yield to the police officer by pulling off of the road and in to the business parking lot of the Lumberjack's Restaurant located at 2795 Main Street, Susanville, California 96130. Moments later, I observed two Susanville police officers speaking with MAYNARD who was seated in the driver seat of the SUBJECT VEHICLE. At this time, I installed a magnetic vehicle tracking device under the rear portion of the SUBJECT VEHICLE. A couple minutes later, I observed MAYNARD continuing along in the SUBJECT VEHICLE.

### I.      **Tracking of the Maynard and the Subject Vehicle**

56.     Following this installation of the vehicle tracking device, USFS agents utilized the location data obtained from the vehicle tracking device to check areas where the SUBJECT VEHICLE travelled and stopped. Between August 3 and August 7, 2021 agents observed MAYNARD to always be the only occupant of the SUBJECT VEHICLE. At no time did agents witness any other people inside the SUBJECT VEHICLE or, in any manner, associated with the SUBJECT VEHICLE, other than MAYNARD.

57.     On August 3, 2021, following the installation of the tracking device, agents followed MAYNARD from Susanville along Highway 36 where MAYNARD eventually turned north on Mooney Road. Agents observed MAYNARD drive approximately five miles north along Mooney Road before turning on to a rocky dirt road where he drove several hundred yards

before parking. At that point, and consistently throughout the course of the entire tracking period, agents observed that the tracking device was accurately recording MAYNARD's location in the SUBJECT VEHICLE. Later this day, agents observed MAYNARD depart this location and continue north along Mooney Road. At this point, and for the remainder of the tracking period, agents checked these remote forested routes and stopping points that tracking data revealed for the SUBJECT VEHICLE, in order to check for evidence of arson. Later, on this same day, tracking data revealed that MAYNARD had turned off of nearby Highway 44 and drove approximately ½ mile up a dirt road and then drove and parked the SUBJECT VEHICLE in a heavily vegetated area that is concealed from any areas where people would normally visit, further referred to as Campsite 1. Prior to turning up this dirt road towards Campsite 1, MAYNARD had driven the SUBJECT VEHICLE past a sign that informed the public that the property was closed to all public entry—this portion of land was owned by a private timber company, Sierra Pacific Industries, that owns sections of land within the Lassen National Forest. According to the vehicle tracking data, the SUBJECT VEHICLE remained in the concealed location of Campsite 1 for the remainder of August 3, 2021 and continued to remain in this location throughout August 4, 2021.

58.     On August 5, 2021 at approximately 4:33 p.m., the vehicle tracking data showed the SUBJECT VEHICLE travelled from Campsite 1 back down to Highway 44. Instead of turning west on Highway 44, which would have made sense as this was the direction that MAYNARD eventually drove along to get to Redding, California that night, the SUBJECT VEHICLE drove across Highway 44 and south on McCoy Road in to the Lassen National Forest. Agents proceeded to check along MAYNARD's route and stopping points for evidence of arson and, indeed, located a wildland arson fire, as discussed next.

V.      **VI. ARSON INVESTIGATIONS ON THE LASSEN NATIONAL FOREST**

A.      **Moon Fire on August 5, 2021**

59.     On August 5, 2021, tracking data showed that the SUBJECT VEHICLE continued south on McCoy Road prior to eventually turning north on Mooney Road. Shortly after the SUBJECT VEHICLE emerged form Mooney Road, USFS Officer Tim Stiefken located

a wildfire burning along Mooney Road on the Lassen National Forest. Officer Stiefken poured some water and took actions that helped contain the fire to a small location on the forest floor that was approximately five feet wide, later named the Moon Fire. Later this day, I observed MAYNARD to be the sole occupant of the SUBJECT VEHICLE.

60.    The tracking data showed that the SUBJECT VEHICLE had travelled past this location at approximately 5:53 p.m. As Officer Stiefken reported the Moon Fire, a responding fire engine finished suppressing the fire and prevented it from spreading further in to the forest. USFS Fire Investigators conducted an origin and cause investigation of the Mooney Fire.  After examining this fire area, investigators excluded all possible causes of this fire, except arson. Investigators did not see any obvious ignition sources located within or near this fire. After reviewing the tracking device data, I know that the SUBJECT VEHICLE drove along Mooney Road during the timeframe that this wildland arson fire was set.

61.    The tracking data showed that the SUBJECT VEHICLE had been travelling approximately 55 miles per hour through the area where the Moon Fire ignited, which is an average speed for this long paved straight-a-way road. The tracking data then showed that the SUBJECT VEHICLE continued approximately ¾ mile north along Mooney Road where it stopped along the shoulder of Mooney Road for one minute and eight seconds. I later observed this fire and this stopping point where MAYNARD had stopped just north of the Moon Fire. I observed that MAYNARD's stopping point was at the end of a long straight-a-way and offered MAYNARD an opportunity to possibly look back and see the location of the fire. Although the tracking data indicated that MAYNARD had not stopped at the Moon Fire, the fire was along Mooney Road on MAYNARD's driver-side, offering the opportunity to deliver an aerial ignition device from the driver's side window. This area was under evacuation notice due to the massive Dixie Fire that was still several miles away, but spreading that general direction.

62.    Following the ignition of the Moon Fire, MAYNARD drove the SUBJECT VEHICLE nearly 100 miles to Redding, California, stopping at an Arco AM/PM gas station on Lake Boulevard. I observed MAYNARD at this gas station in Redding where he remained parked at a gas pump for approximately one hour.

63. Following this trip to the Arco AM/PM gas station in Redding, the tracking data then showed the SUBJECT VEHICLE drove over 100 more miles along forest highways east of Redding back towards the Lassen National Forest, only to return all the way back to the Redding area, specifically a 7-11 gas station located just south of Redding in Anderson, California. I later reviewed store video recordings of MAYNARD and the SUBJECT VEHICLE arriving and purchasing a few beverage items at this 7-11 gas station. Following this 7-11 gas station trip, tracking data then showed the SUBJECT VEHICLE returned all the way back, nearly 100 miles, to the Lassen National Forest.

64. By August 6, at approximately 6:30 a.m., the tracking data showed the SUBJECT VEHICLE was parked in a new location, further referred to as Campsite 2. Campsite 2 was not located along a road, but was several hundred feet from the nearest dirt Forest Service road and just a few miles from Campsite 1. Similar to Campsite 1, Campsite 2 was a heavily forested location that was concealed from anybody travelling adjacent roadways. To reach Campsite 2, MAYNARD had turned off of Highway 44 and on to Conard Road, passing a road closure sign in the process and entering this emergency closure area. The air, at this point, had become increasingly thick with smoke that was pouring in from the Dixie Fire. Despite the emergency closure, closure signs, law enforcement presence at major roads, broadcasted Verizon Wireless fire and evacuation alert messages, and the heavy smoke, MAYNARD continued seeking out concealed areas to position himself in the closure area. After driving hundreds of miles after the Moon Fire, only to return to the area and settle at Campsite 2, all tracking data locations showed the SUBJECT VEHICLE remained at Campsite 2 for approximately the next 28 hours until MAYNARD eventually began driving again during the morning hours of August 7, 2021.

**B.** **Ranch Fire on August 7, 2021 (Charged Count for Complaint)**

65. On August 7, 2021, at approximately 10:39 a.m., vehicle tracking data showed that the SUBJECT VEHICLE began travelling away from Campsite 2 and drove along Forest Service Road 30N42A to Forest Service Road 30N42 and then south along Conard Road on the Lassen National Forest in Lassen County. Later on this same day and in this same general area of the Lassen National Forest, officers identified MAYNARD as the driver and sole occupant of

the SUBJECT VEHICLE.

66.     Agents began inspecting the locations and routes where the tracking data showed the SUBJECT VEHICLE had travelled and stopped. From Highway 44, I hiked several hundred yards towards Campsite 2 where the SUBJECT VEHICLE had been parked for approximately the previous 28 hours. As I neared Campsite 2, I observed a large column of grey and black smoke rising from the forest. I ran back to my vehicle and proceeded to notify the local USFS Fire Dispatch Center. I then returned to the fire, later named the Ranch Fire, and observed the wildfire burning along the forest floor, trees, and brush—an area that consisted of approximately ½ to 1 acre in size. I then observed the tire track impressions that had been left behind by the SUBJECT VEHICLE, which were located at the edge of this new wildland fire. According to the vehicle tracking data, these tire track impressions in the soil were in the same location that the SUBJECT VEHICLE had just been present for the previous 28 hours. I observed that the location of Campsite 2 and the recently ignited fire was not along a road. To access this location where the SUBJECT VEHICLE had been parked, which I could tell by the tire track impressions at the edge of this new wildland fire, the SUBJECT VEHICLE had been driven off-road and navigated over 100 feet around trees and brush and was concealed from all roads in the general area.

67.     California Department of Forestry and Fire Protection (CAL FIRE) Law Enforcement Officer Mark Rotlisberger responded to this new fire to conduct an origin and cause investigation. Officer Rotlisberger has been a qualified wildland fire investigator for approximately nine years and has investigated or assisted with the investigation of over 100 wildland fires, to include many wildland arson fires.

68.     Officer Rotlisberger located and examined the specific origin area where the Ranch Fire first ignited. This location was located next to the tire tracks impressions where the SUBJECT VEHICLE had been present. This origin area was within the Lassen National Forest and portions of the fire then spread to land owned by Sierra Pacific Industries. Following his examination of the specific origin area, Officer Rotlisberger determined the fire had first ignited on the forest floor where the remnants of leaves, pine needles, and broken bottles remained.

Investigators did not locate any sources that had ignited the fire. After considering all potential causes of the Ranch Fire, Officer Rotlisberger determined the Ranch Fire's probable cause as arson. Based on the vehicle tracking data that placed the SUBJECT VEHICLE at the fire's origin during the time-frame this fire ignited and learning the results of the origin and cause investigation findings, the evidence indicated that MAYNARD had set this fire with an unknown fire-setting device.

      C.      **Conard Fire on August 7, 2021**

69.     Shortly after I located the Ranch Fire, USFS Special Agent Ted Williams was inspecting another area approximately three miles away where the tracking data showed the SUBJECT VEHICLE had travelled towards and then stopped about six minutes after departing Campsite 2. The tracking data showed that the SUBJECT VEHICLE had stopped in this new location for over 30 minutes. It was here that Agent Williams discovered a second fire, later named the Conard Fire. Agent Williams observed this fire had spread through approximately ½ to 1 acre of the Lassen National Forest. According to the tracking data, the SUBJECT VEHICLE had driven to this exact location and stopped at this location at approximately 10:45 a.m.—just minutes after departing the location where MAYNARD is suspected to have set the Ranch Fire a few miles away.

70.     Officer Rotlisberger conducted the origin and cause investigation of the Conard Fire. Officer Rotlisberger located and examined the specific origin area where the Conard Fire first ignited. Officer Rotlisberger did not locate any sources that had ignited this fire. After considering all potential causes of the Conard Fire, Officer Rotlisberger determined the Conard Fire's probable cause as arson. Based on the vehicle tracking data that placed the SUBJECT VEHICLE within a few feet of the Conard Fire's specific origin area during the time-frame this fire ignited and learning the results of the origin and cause investigation findings, the evidence indicated that MAYNARD had set this fire with an unknown fire-setting device. It appeared that MAYNARD was in the midst of an arson-setting spree.

### D.     Conard Arrested in the Closure Area

71.     Following the ignition of the two wildland arson fires, the vehicle tracking data showed the SUBJECT VEHICLE continued travelling around nearby forest roads on the Lassen National Forest. State and local law enforcement officers responded to the area after overhearing there were multiple new fires set in the area. MAYNARD eventually returned to an area not far from the Conard Fire that MAYNARD is suspected to have ignited just a few hours earlier. Based on my training and experience, I know that arsonists have been known to return to their fires.

72.     California Highway Patrol (CHP) Officer Bob Wilburn observed MAYNARD driving the SUBJECT VEHICLE through the emergency closure area towards the Conard Fire that was located just a few miles away. At that time, Officer Wilburn contacted MAYNARD for his unauthorized presence in the closure area. Officer Wilburn identified the driver and sole occupant of the SUBJECT VEHICLE as GARY STEPHEN MAYNARD. During Officer Wilburn's discussion with MAYNARD, Officer Wilburn detected an odor consistent with marijuana emanating from the SUBJECT VEHICLE. Officer Wilburn advised me that a probable cause search for open containers of marijuana was conducted of the SUBJECT VEHICLE, which resulted in Officer Wilburn locating an open container of marijuana and issuing a citation to MAYNARD for having an open container of marijuana present in the SUBJECT VEHICLE. Officer Wilburn advised me that he recalled seeing MAYNARD's flat-style cellular phone sitting on the top of the dashboard in the SUBJECT VEHICLE and recalled that he could see the phone's front screen through the windshield and the screen displayed a map application that read somethings along the lines of, "directions to Old Station, avoid highways."

73.     Following the CHP traffic stop of the SUBJECT VEHICLE, Lassen County Sheriff's Deputies arrested MAYNARD for his violation of California Penal Code 409.5, unauthorized entry into a closed emergency area.

74.     USFS agents met with MAYNARD and advised MAYNARD of his Miranda Rights. MAYNARD voluntarily waived his Miranda Rights and agreed to speak with agents. During this interview, MAYNARD advised that he had stayed in Old Station the previous night.

Old Station is a community approximately 50 miles west of Campsite 2. I know, based on the tracking data and agents' observations, that MAYNARD had not been staying in Old Station the previous night. MAYNARD further advised that he had arrived earlier that day, having driven from Old Station along Highway 44 and into the forested area where he had been hiking for about an hour prior to being arrested. MAYNARD denied setting any fires. Agents advised MAYNARD that his tire tracks were located next to a nearby wildland fire. MAYNARD denied setting any fires and, at one point, stated that if the agents were going to accuse him of starting fires that he would defend himself in court.

75.     Lassen County Sheriff Deputy Steven Lawton booked MAYNARD in to the Lassen County Jail for violating California Penal Code 409.5, unauthorized entry into a closed emergency area. Later that evening, Deputy Lawton advised MAYNARD that a felony charge of arson (California Penal Code 451) was being added. At that point, Deputy Lawton advised me that MAYNARD became enraged and began kicking the jail cell door and screamed, "I'm going to kill you, fucking pig! I told those fuckers I didn't start any of those fires!"

76.     Following MAYNARD's arrest, the SUBJECT VEHICLE was removed by USFS officers and is currently being stored as evidence of arson at a secure Forest Service facility in Susanville. MAYNARD's personal property, to include his phone, was secured within the SUBJECT VEHICLE at the time MAYNARD was arrested.

### E.     Search of Subject Vehicle and Contents

77.     Based on my training and experience, I know that vehicles are commonly used by arsonists during the commission of their fire-setting crimes. I know that vehicles used by arsonists often contain the instrumentalities of their fire-setting crimes such as matches, lighters, and incendiary devices. Based on my training and experience, I know that other evidence of arson is often contained within their vehicles such as items that exhibit burn marks, soot, or ash. During the course of this investigation, agents determined that MAYNARD appeared to be living out of the SUBJECT VEHICLE, further leading agents to believe that most of his possessions, to include any evidence, fruits, and instrumentalities of arson are contained within the SUBJECT VEHICLE.

78.     Based on this investigation, the recently identified cellular phone number being used by MAYNARD, and the recent observations of CHP Officer Wilburn, I know the SUBJECT VEHICLE currently contains at least one cellular phone and one laptop computer because Officer Wilburn told me he observed a cell phone and a laptop computer sitting in plain view during his traffic stop with MAYNARD. I believe that MAYNARD owned and/or possessed this cell phone and laptop computer during the time he committed the recent arsons and these devices therefore contain evidence of MAYNARD's arson-related activities, such as photographs, video recordings, and location data. Based on my training and experience, I know that cell phones and computers often contain particular information about the user's location history, internet search history, videos, photographs, electronic communications such as emails and text messages, notes, and various electronic accounts. I also know through experience, that it is not uncommon for one person to possess more than one cellular phone.

79.     Based on my training and experience, I know that arsonists are often infatuated with fires and that electronic devices and electronic storage devices may contain records and information related to arsonists, firefighting, fire departments, law enforcement departments, fire investigations, fire laws and regulations, incendiary devices, articles related to fires. Based on my training and experience, I know that many electronic devices have capabilities that may reveal the location of MAYNARD, the SUBJECT VEHICLE, or devices including maps, journals, logs and communications in whatever form, as well as digital location data and records from devices and applications on devices such as cellular phones and GPS devices.

80.     I also know, as described above, that MAYNARD has traveled over vast portions of California over at least the last month. Based on my training and experience, I know that arsonists commonly set more than one arson fire and that some arsonists scout areas in which to set fires before setting them. As a result, I believe that information related to MAYNARD's travel in the months leading up to the arson fires described above may provide evidence related to those fires. Arsonists may also conduct internet research regarding fires, locations to set fires, incendiary devices and conditions favorable for setting fires (such as favorable weather conditions). This type of research can remain in the search history on a phone or other digital

device long after the internet search is completed. In particular, MAYNARD's fires as described above were set in the vicinity of other large ongoing wildfires. Based on this proximity, it is likely that MAYNARD had previous knowledge that these wildfires were ongoing and selected the location to set his fires based on that knowledge.

81.     Based on my training and experience, I also know that the condition of a vehicle can be evidence of arson. Evidence that a vehicle is working properly, or working in a manner inconsistent with having started a particular fire, can be evidence of arson because it eliminates a potential cause of an arson-fire. As a result, if a vehicle is mechanically inspected and eliminated as a potential cause of a fire, it is more likely that a fire was intentionally set.

## VI.     COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

82.     As described above and in Attachment B, this application seeks permission to search for records that might be found on in the SUBJECT VEHICLE, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

83.     *Probable cause.* I submit that if a computer or storage medium is in the SUBJECT VEHICLE, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

  a.  Based on my knowledge, training, and experience, I know that computer files
      or remnants of such files can be recovered months or even years after they
      have been downloaded onto a storage medium, deleted, or viewed via the
      Internet. Electronic files downloaded to a storage medium can be stored for
      years at little or no cost. Even when files have been deleted, they can be
      recovered months or years later using forensic tools. This is so because when
      a person "deletes" a file on a computer, the data contained in the file does not
      actually disappear; rather, that data remains on the storage medium until it is
      overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

84.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT VEHICLE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the

storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the

chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on

the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I also know that when an individual uses a computer or other electronic device in the course of committing a wildland arson, the individual's computer may serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer can be an instrumentality of the crime because it can be used as a means of committing the criminal offense, for example, by searching the internet for information regarding arson, setting fires, tools and techniques used by investigators investigating arson-fires as well as techniques for making it more difficult to detect arson, fire suppression and detection methods, and weather reports (to determine if conditions are favorable for setting an arson fires). The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes, photographs or videos as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

85. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

86.     *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VII.     CONCLUSION

87.     Based on the above facts, I submit that there is probable cause to believe that GARY STEPHEN MAYNARD committed violations of 18 U.S.C. § 1855, which criminalizes willfully setting fire to any timber, underbrush, or grass upon lands owned by the United States.

88.     Based on the facts set forth in this Affidavit, I request that search warrants be issued for the vehicle, described further in Attachments A, for the evidence described in Attachment B.

89.     Based on the same facts as set forth in this Affidavit, I also request that a criminal complaint and arrest warrant be issued for GARY STEPHEN MAYNARD.

## VIII.     SEALING REQUEST

90.     I further request that the Court seal the warrants and this Affidavit and the application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the USFS, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrants.

91.     These documents pertain to and discuss an ongoing criminal investigation that is not public nor is all information regarding the ongoing investigation known to its target. Accordingly, there is good cause to seal these documents because their premature disclosure may jeopardize the investigation by disclosing the facts known to investigators before they can

AFFIDAVIT OF TYLER BOLEN                                          31

complete the investigation and preserve all of the evidence. Sealing these documents will also better ensure the safety of agents and others charged with executing the warrants in the event that MAYNARD is released from state custody before agents are able to serve the arrest warrant sought in this application.

92.     I further request that the criminal complaint and affidavit be unsealed upon arrest of defendant MAYNARD.

Respectfully submitted,

/s/ Tyler Bolen

TYLER BOLEN
Special Agent
U.S. Forest Service

Subscribed and sworn to before me telephonically on:  August 8, 2021

The Honorable Dennis M. Cota
UNITED STATES MAGISTRAT JUDGE

Dated:  August 8, 2021

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

/s/ Michael D. Anderson
Approved as to form by AUSA MICHAEL D. ANDERSON